## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 16 2017, 7:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Marjorie Newell
Deputy Attorneys General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of P.Y. and J.Y. (Minor Children), and

R.Y. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

February 16, 2017

Court of Appeals Case No. 49A02-1609-JT-2033

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Larry Bradley, Magistrate

Trial Court Cause Nos. 49D09-1512-JT-766, -767

**Crone, Judge.**

# Case Summary

R.Y. ("Mother") appeals the trial court's order involuntarily terminating her parental rights to her minor children P.Y. and J.Y. (collectively "the Children"). We affirm.

# Facts and Procedural History

The Children were initially removed from Mother's care in December 2012, and after progress toward reunification failed, the Marion County Department of Child Services ("DCS") filed petitions to terminate Mother's parental rights to the Children on December 18, 2015. Evidentiary hearings were held on May 11 and June 20, 2016. The trial court entered its order terminating Mother's parental rights on August 15, 2016, and found the following relevant facts:[1]

> 1. Mother is the mother of P.Y. and J.Y., minor children born on May 30, 2004 and August 12, 2005, respectively.
>
> 2. The Children's father is deceased.
>
> 3. Child in Need of Services Petitions "CHINS" were filed on the Children on December 27, 2012, under Cause Numbers 49D091212JC048952 and 49D091212JC048953, on

---

[1] We note that the trial court entered a nunc pro tunc order on August 23, 2016, to make a correction. We further note that trial court's termination order refers to the parties by their full names. We use "Mother," "the Children," or each child's initials where appropriate.

allegations of inappropriate sexual activities and educational neglect.

4. The Children were involved in a previous CHINS proceeding from April 5, 2007 to June 26, 2008 after Mother requested the Children be removed from her care due to being unemployed and having to prostitute.

5. The Children were ordered detained and placed outside the home at the December 27, 2012 initial hearing.

6. Mother was appointed counsel and supervised parenting time was ordered.

7. On February 20, 2013, Mother admitted that the Children were in need of services "because one of the children has reported seeing inappropriate sexual materials in the home. The son has been looking at inappropriate material on the internet. The daughter has been taking naked pictures of herself, has been masturbating with markers, has demonstrated issues with personal boundaries and has been drawing sexual images. Therefore, the coercive intervention of the courts is necessary."

8. The CHINS Court adjudicated the Children to be in need of services.

9. Disposition was held on March 8, 2013, at which time the Children remained detained from their mother and placement continued out of the home.

10. The Children had been removed from their mother for at least six (6) months under a disposition decree prior to this termination action being filed on December 18, 2015.

11. The Children had been removed from the home and placed under the care and supervision of [DCS] for at least fifteen (15) of the most recent twenty-two (22) months prior to the filing of this termination action.

12. A Parental Participation Order was issued for Mother to engage in services consisting of home based services, a parenting assessment and follow recommendations therefrom, and completing a psychological evaluation and follow recommendations.

13. Due to a domestic violence incident in 2014, Mother was ordered to undergo a domestic violence assessment and follow recommendations. She successfully completed a twenty-six week program.

14. Mother completed a parenting assessment which recommended home based therapy. Mother engaged in individual and family therapy with the Children.

15. Mother was engaged with Camike Jones as a therapist from mid-2014 until December 2015, toward gaining insight into how her choices affect her parenting and how to effectively communicate and interact with her children.

16. Therapist Jones felt Mother had made some progress developing insight but there were set backs as well.

17. Mother blamed P.Y. for the involvement with [DCS] throughout the CHINS case, and at the time of trial was still in fear that P.Y. would "misspeak again."

18. Therapist Jones recommended ongoing therapy in December 2015, at the end of her referral. She also believed

that Mother would not be capable of parenting without regular and ongoing mental health treatment, and that medication would be important.

19. Therapist Daniel Wright, working with the family, believed the CHINS case could not move forward without Mother addressing her mental health issues. Mother ended her therapy with Mr. Wright in October 2015 at which time she was seen to have regressed.

20. Mother has mental health diagnoses of Post-Traumatic Stress Disorder, Anxiety, Depression, and Borderline Personality Disorder.

21. A psychological evaluation was referred for Mother which she completed. Evaluation recommendations included completing a medical evaluation and participat[ing] in mental health/substance abuse dual diagnosis program.

22. Mother did start attending Eskenazi Health in late September 2015. She missed several appointments and there was some conflict with the provider. Mother's last appointment made was on January 8, 2016. She was no longer attending Eskenazi and needed [DCS] to pay for it.

23. The Eskenazi treatment plan [] included a diagnosis of PTSD and unspecified personality disorder evidenced by flashbacks, is irritable, avoids places that remind her of her trauma, isolates herself from others and has anger outbursts.

24. Mother testified she only needed to take an anxiety medication, Cymbalta, as needed and she no longer needs it as she is not dealing with the family case manager. Eskenazi

notes represent that Cymbalta was prescribed for Mother's low mood and trauma condition.

25. Mother is against taking mental health medication.

26. In 2015, parenting time became unsupervised and the team was moving toward in-home temporary trial visitation. Due to Mother displaying unpredictable and emotional behavior, as well as appearing overwhelmed to be caring for the Children, visits went back to supervised status.

27. Ben Combs was the children's foster care treatment coordinator. As a result of adverse behavior he received from Mother, he became concerned for the Children's safety when unsupervised with their mother, and felt Mother needed therapy to address issues.

28. Mother's last visit with J.Y. was in December 2015. P.Y wished to discontinue visits with her mother in July 2015.

29. The Children are in a preadoptive home. They have blended into the foster family.

30. P.Y. wishes to be adopted.

31. J.Y. wants to be back with his mother "when she is better."

32. The Children remain in ongoing therapy.

33. P.Y. needs therapy to continue to address emotional neglect, trauma, Post[-]Traumatic Stress Disorder, and

depression. She also has had past sexual maladaptive behaviors for which she will need aftercare as she ages.

34. P.Y.'s behaviors have improved in her current placement and her mood improved after visits with her mother were stopped.

35. J.Y.'s original therapy helped him deal with anger and bad behaviors such as stealing. His relationship with his sister is stabilizing.

36. J.Y. has a more positive relationship with his mother. There remain concerns about Mother's ability to provide a stable home and one that is emotionally and physically safe.

37. At the time of trial, Mother was sharing a one[-]bedroom apartment.

38. Mother testified she was going to start employment at the airport. Although no vouchers were offered at trial, Mother testified that she had recently done restaurant work. Her Eskenazi medical notes indicate she was working temporary jobs during that time.

Appellant's App. at 6-8. The trial court further found that the family case manager, the guardian ad litem, and three therapists that had worked with the family each opined that termination of Mother's parental rights was in the Children's best interests.

[3] Based upon these findings of fact, the trial court concluded that: (1) there is a reasonable probability that the conditions that resulted in the Children's

removal and continued placement outside the home will not be remedied by Mother; (2) there is a reasonable probability that the continuation of the parent-child relationship between Mother and the Children poses a threat to the Children's well-being, (3) termination of the parent-child relationship between Mother and Children is in the Children's best interests; and (4) DCS has a satisfactory plan for the care and treatment of the Children, which is adoption. Accordingly, the trial court determined that DCS had proven the allegations of the petitions to terminate parental rights by clear and convincing evidence and therefore terminated Mother's parental rights. This appeal ensued.

## Discussion and Decision

[4] "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.,* 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id*. A petition for the involuntary termination of parental rights must allege in pertinent part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the

parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[5] "We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

## Section 1 – DCS presented clear and convincing evidence that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied.

Mother contends that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied.[2] In determining whether there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id.* Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (quoting *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination

[2] Mother also argues that DCS failed to prove that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children. However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Accordingly, we will address the sufficiency of the evidence with regard to only one of the three requirements.

proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[7]     The Children were originally removed from the home after it was reported that both Children had been engaging in inappropriate and maladaptive sexual behaviors and, additionally, their school attendance was not satisfactory. Home-based therapy was recommended to allow Mother to gain insight into how her choices affect her parenting and also for her to learn how to effectively communicate and interact with the Children. The record indicates that while Mother did initially participate and made some progress in home-based therapy, she did not significantly benefit or improve her parenting skills due to her failure to address her largely untreated mental health issues. Mother has been diagnosed with post-traumatic stress disorder, anxiety, depression, and borderline personality disorder. She was referred for dialectical behavioral therapy to address her personality disorder; however, the record indicates that she did not complete such therapy.

[8] In addition, although Mother completed a parenting assessment and psychological evaluation, she failed to follow through with the parenting skills recommendations or therapy recommendations for mental health treatment. Regarding mental health treatment, she attended some appointments, missed several others, and had conflict with her care provider. Mother has a history of extreme volatility in her personal relationships and has consistently blamed P.Y. for the CHINS matter rather than taking personal responsibility for the Children's removal and continued placement outside of her care. Indeed, Mother continued to lack any insight during the termination proceedings, as she maintained that it was P.Y.'s "mistake" of "misspeak[ing] in mixed company" during a school field trip about inappropriate sexual things going on in the home that would be the reason P.Y. "loses touch with her entire family for the rest of her life[.]" Tr. at 154, 167.

[9] In the three and one-half years since the Children's removal, Mother has only been allowed unsupervised visitation for a very brief period due to safety concerns for the Children based upon Mother's inappropriate and unpredictable behavior and her apparent feelings of being too overwhelmed to care for the Children. At the time of termination, Mother continued to claim that she did not need medication, and she admitted to not taking her prescribed medications as recommended. Mother admitted to having been recently arrested and charged with two felonies and four misdemeanors, charges stemming from a romantic relationship in which she "wasn't being respected," and she stated that she was currently serving an eighteen-month sentence in community

corrections. *Id.* at 171. In addition, at the time of the hearing, Mother admitted to not having adequate housing for the Children. Judging Mother's fitness at the time of the termination proceeding, the evidence indicates that she continues to demonstrate a habitual pattern of unwillingness to deal with her parenting problems and mental health issues such that there is a substantial probability of future neglect and deprivation. DCS presented clear and convincing evidence that there exists no reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will be remedied.

## Section 2 – DCS presented clear and convincing evidence that termination of Mother's parental rights is in the best interests of the Children.

[10] Next, we address Mother's assertion that DCS failed to present clear and convincing evidence that termination of her parental rights is in the Children's best interests. In determining the best interests of a child, the trial court must look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.S.,* 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). "In so doing, the trial court must subordinate the interests of the parent to those of the child." *Id.* Children have a paramount need for permanency, which our supreme court has deemed a central consideration in determining a child's best interests. *E.M.,* 4 N.E.3d at 647-48. Courts "need not wait until a child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship." *Id.* at 648 (citation

omitted). We have previously determined that the testimony of the case worker and/or guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[11] DCS family case manager Michelle Johnson testified that she believed that termination of Mother's parental rights is in the Children's best interests due to the Children's need for permanency. She opined that Mother's untreated mental health issues are the main barrier to her being able to properly parent the Children. Johnson stated that she did not believe that additional time would aid Mother to reunify with her Children, noting that, since the CHINS case began in 2012, DCS had seen "no real, true progress in terms of stability and structure that [Mother] can provide for her children." Tr. at 107. Johnson relayed that she felt that adoption by the Children's current foster family is in their best interests.

[12] Similarly, guardian ad litem Sandra Donaldson recommended that adoption is the best option for the Children and that it would be in the Children's best interests if Mother's parental rights were terminated. Donaldson stated that the Children have been "from one place to another" over the past several years and that now "they just need stability." *Id*. at 114. Donaldson did not believe that it would be fair to the Children to allow Mother more time to complete services because "she had a lot of time already[.]" *Id*. at 115. Donaldson emphasized the paramount importance of permanency for the Children, stating that "they

need um knowing that they're not going to be removed … they're not going to be placed in a situation that they're uncomfortable in." *Id*. at 114-115.

[13] Moreover, multiple therapists that have worked with both Children expressed their extreme concerns about Mother's mental health and her ability to parent the Children, and each stated that he or she supported the plan that the Children be adopted by their current stable and nurturing foster family. While we agree with Mother that the Children's need for immediate permanency is not reason enough on its own to terminate her parental rights, *see In re V.A.*, 51 N.E.3d 1140, 1152 (Ind. 2016) (declining to find the need for permanency enough to terminate parental rights when father had an established relationship with his child and had taken positive steps in accordance with a parent participation plan toward reunification), the record here is replete with evidence indicating that despite ample opportunity over the years, Mother remains in a state of denial and is unwilling to take the steps necessary regarding her mental health and parenting skills to make reunification with the Children feasible. DCS presented clear and convincing evidence that termination of Mother's parental rights is in the Children's best interests.

[14] In sum, the evidence and reasonable inferences favorable to the trial court's judgment support the termination of Mother's parental rights to the Children. Mother has failed to demonstrate that the court's termination order is clearly erroneous, and therefore we affirm the judgment of the trial court.

Affirmed.

Riley, J., and Altice, J., concur.